## Richmond.

SANDS AND OLIVER V. QUIGG.

November 17, 1910.

Absent, Cardwell, J.

1. WORKING CONTRACTS—*Retained Percentage—Set-off—Case at Bar.*— In a suit by a sub-contractor against a contractor to recover for retained percentage, extra work, monthly estimates, damages, &c., the contractor has the right, upon general principles governing the right of set-off, to have allowed in this favor any demand that he may establish against the sub-contractor for the breach of his contract with him. In the case at bar, the contract expressly stated that time was of its essence, and the contractor was compelled to expend a large sum of money for additional forces put on the work, as it was provided by the contract that he might do, in order to complete the work in contract time, and this was held to be a valid set-off, independent of the provision of the contract which permitted the contractor to hold the retained percentage as a guaranty of the faithful performance of the contract.

2. WORKING CONTRACTS—*Sub-contract—Defaults as to Time.*—The fact that a general contractor and other sub-contractors are in default in the completion of work in the contract time, is no excuse for the failure of a sub-contractor to complete his part of the work in the time stipulated by him.

3. WORKING CONTRACTS—*Time of Performance—Delays—Bad Weather.* —Delays from bad weather, or the loss of equipment and stock by fire, cannot control the express terms of a contract entered into by a party who contracts to complete a piece of work at a stipulated date.

Appeal from a decree of the Circuit Court of Roanoke county. Decree for the complainant. Defendants appeal.

*Reversed.*

The opinion states the case.

*Wilson & Manson,* for the appellants.

*Hall, Woods & Jackson,* for the appellee.

KEITH, P., delivered the opinion of the court.

Sands and Oliver had a contract with the Tidewater Railway Company for the construction of its road from a point near Norfolk, in the eastern part of the State, for ninety-five miles, in a westwardly direction. The construction of sections 86, 87, 88, 89 and 90, of this road, was sub-let by the general contractors to William H. Quigg. A controversy having arisen between the contractors and the sub-contractor, Quigg filed his bill in the Circuit Court of Roanoke county, in which he claimed that there was a balance due him for the retained percentage under his contract of $2,995.63, on a final estimate $865.05, for extra work $299.51, damages for breach of contract $4,500, an extra allowance of three cents per yard on 103,997 yards of extra work $3,119.91, and extra work allowed by resident engineer $103.90; aggregating $11,884.00.

When the cause came on to be heard upon the bill and answer and the exhibits filed and proofs taken, the circuit court entered a decree for the items of retained percentage, final estimate and compensation for extra work, aggregating $4,137.61, and disallowed the residue of the account. Sands and Oliver applied for and obtained an appeal, which brings the case before us for review.

It is conceded by the appellants that the appellee earned and was entitled to the several items which made up the amount decreed in his favor; but it is claimed that the appellants had the right to set off against these amounts certain damages which they sustained by reason of the failure of appellee to comply with his contract.

The contract between the railway company and Sands and Oliver provides that from the Seaboard Air Line crossing (near the eastern terminus of the road) westwardly the work shall be completed so that the railway company may 'begin laying track on the first day of November, 1905, and can, continuously thereafter, lay track westwardly at the rate of three-fourths of a mile per day, without being delayed by the work of the parties of the second part. By the contract between Sands and Oliver and Quigg, the sub-contractor, it is provided that ninety *per cent.* of the current estimate of work done should be paid to the sub-contractor as an advance, upon certain terms and stipulations which need not be further noted, but that ten *per cent.* of such monthly estimates should be retained by the general contractors until the work was completed and received by the engineer and the contractor, "the said retained percentage to be held by the contractor as a guarantee of the faithful performance of this contract as herein stipulated, and to be applied as herein set forth." By section 4 of the contract it was agreed that the sub-contractor should begin work on or before the same day as Sands and Oliver's contract, and complete the same on or before the same day as Sands and Oliver's contract; and it was further agreed that the sub-contractor should "place on said work on or before the time set for the commencement of the said work * * * sufficient outfit to complete work in contract time."

By the 5th article of the agreement it is declared that "Time is the essence of this contract, and it is distinctly understood and agreed that the contractor, if in his opinion it is necessary to insure the completion of the work at the time specified in this contract, has the right to order the work prosecuted at such points and with such forces as he deems proper; or he can employ additional forces and put on the work to complete the same in the specified time, deducting the cost of such additional forces from such amount as may be due the sub-contractor on monthly estimates and retained

percentage. It is further agreed that the contractor reserves the right, if in his opinion the work is not being prosecuted with such forces and in such manner as to insure its completion in the contract time, to declare this contract null and void, after giving the sub-contractor notice in writing. In this case all rights of the sub-contractor under these articles of agreement shall from that date cease, and the contractor may at once proceed to enter into possession of the work or any part of it, and the retained percentage of the sub-contractor is hereby forfeited to the contractor, to compênsate the latter for the work that may be necessary to complete this contract."

Quigg fell behind with his work, and it became apparent that it would not be completed within the period stipulated by his contract. The general contractor and other contractors were also in arrears with their portion of the work, and in this condition of affairs Sands and Oliver entered into a supplemental agreement with the railway company, by which an extension of time was granted for the completion of the work. This agreement was of course in the interest of the sub-contractors, and in the case of the contract which was sub-let to Quigg for sections 86 to 90, the contractors were given until August 15, 1906, to complete the work so that track laying might begin on the east end thereof.

It will be observed that when the supplemental contract was entered into, the time within which Quigg's work was to have been completed, had already expired. By one of the terms of the supplemental contract it was agreed, that "for each and every day after the expiration of the dates herein mentioned on the various sections, said contractors shall be in default of completing his said work according to the terms of this agreement and the original contract, that said contractor shall forfeit and pay to the company one hundred dollars as liquidated damages to said company, said sums of money to be retained by the company from any money it may be

owing said contractor. This is to be in lieu of any other damages." As by section 8, it is provided, that "the contractor will immediately and without delay place sufficient additional force upon said work, including two additional steam shovels and outfits, to enable it to complete its work as herein provided, and it is further agreed that if they shall fail to do so within thirty days from this date said company shall have the right under its contract to enter upon said unfinished portions and cause the same to be completed at the expense of the contractor."

The evidence shows that Quigg did not so prosecute his work as to enable him to finish it within the stipulated time, though he was frequently importuned upon the subject, urged to put on additional forces, and was finally notified verbally that the contractors would proceed to employ additional forces and put them on the work, so that it might be completed within the specified time, in order to avoid the penalty of $100 per day above set out. The evidence proves that in doing this work, which it was the duty of Quigg to have done and which he failed to do, Sands and Oliver expended sums of money largely in excess of the amount decreed in Quigg's favor.

As to the retained percentage, it would seem that by the express terms of the contract between Sands and Oliver and Quigg, they had the right of set off, for the contract says, "the said retained percentage to be held by the contractor as a guarantee of the faithful performance of this contract as herein stipulated." But upon general principles governing the right of set off, independently of the terms of the contract, Sands and Oliver had the right to have allowed in their favor any demand that they might establish against Quigg for breach of his contract with them.

The contention of the appellee is that appellants were proceeding under that clause of their contract with Quigg, which authorizes them, if in their opinion the work was not being

prosecuted with such forces and in such manner as to insure its completion in the contract time, to declare the contract null and void after giving the sub-contractors notice in writing.

We do not think the record sustains this position. We are of opinion that the contractors were acting under that clause of their contract which authorizes them to employ additional forces and put them on the work to complete the same within the specified time, deducting the cost of such additional forces from such amount as may be due the sub-contractor on monthly estimates and retained percentage.

Counsel for the appellee suggests that not only their client but the appellants and every other sub-contractor engaged on the ninety miles of road were in default; but it is not perceived that this suggestion excuses the appellee from a compliance with his contract. All who were engaged upon the work suffered from bad weather and from the many casualties incident to such employment, and the appellee seems to have been delayed by the result of a fire which consumed his equipment, including much of his live stock; but these considerations cannot control the express terms of the contract into which the parties entered. From the very nature of the work time was of the essence of the contract, and it is expressly so declared upon its face.

We are of opinion that the appellants should have been allowed to set off their demands against the sums allowed to the appellee in the decree appealed from, and that the decree of the circuit court should be reversed; and the cause remanded for further proceedings in accordance with the views expressed in this opinion.

*Reversed.*